Judge Nicholas
delivered the Opinion of the Court.
Mrs. Morrison, having renounced the provision made for her by the will of her deceased husband, jinited in ¿bill with some of his children, for a settlement and distribution of the personal estate, and also claiming dower in seven slaves, which her husband sold and conveyed, during his last illness,- to his brother David C. Morrison. She states that these slaves were all that her husband owned; that their sale and conveyance were secretly made and purposely concealed from her, until after she had made her renunciation of the will, and were then immediately taken into possession by David C. Morrison ; that previous to her renunciation, she had consulted with him, whether she ought to renounce or not; that he advised her to do it, and made a calculation of the value of her third of the slaves, to prove to her that such was her interest.
He admits that the conveyance to him was secretly made, and states that, it was concealed from her during her husband’s life, at his particular request; admits that he staid a night at her house, between the death of her husband and her renunciation; that whilst there, she consulted with him whether she ought to renounce, and *14 that he did not disclose to her his purchase of the slaves, but denies that he advised her to make the renunciation, or made any calculation áhewing it would be for her interest ; on the contrary, he says he expressly declined giving tier any advice on that subject, and referred her to her father, as the more proper and equally competent person to give her advice.
A man makes a bill of sale to his brother, in secret, of all his slaves, and dies, leaving a will in which he pro vides for his widow. She thinks of renouncing the provision q-taking the dower allowed bylaw, and consults the brother on the subject. He, nev- ’ ertheless, conceals from her the fact, that the slaves had been conveyed to him, until she has made an election not to take under the, will: — held that the concealment was a fraud upon the widow— in consequence of which she shall be allowed her dower in' the slaves, the secret conveyance in the husband’s life time notwithstanding,
It is unnecessary to determine, whether the testimony of the witness relied on to prove he gave the advice as charged, be admissible, and if admissible, whether it would be sufficient, with the other circumstances, to prove that he did, in opposition to the express denial of his answer. We think his own admissions entitle her to the relief prayed against him.
It is not necessary to the case that he should actually have given the advice. The law, equally with morality, requires that he should have disclosed his title to the slaves, as well as forborne to give such advice. Every principle of ethics and.of law, that requires the forbearance of the one, equally enjoins the performance of the other. The one was as much calculated to deceive and produce the injury,' which ensued, as the other. No blameless motive can be presumed for his failure to disclose his title, when he knew that the possession of that information was indispensable to. her, in order to attain a correct conclusion as to her true interest, on the subject about which she was consulting him. Even the alleged motive, for the original concealment, had ceased with her husband’s death. None can be imagined for continuing it afterwards, but that of thereby tempting her to commit the act she did, to her own prejudice, through ignorance of the sale to him. He' knew she was in error on that subject, and supposed the slaves liable to her dower claim. . His failing to undeceive her, could only have resulted from a desire, on his part, that she should injure herself by making the renunciation. The obligation on -him to make the disclosure was the more imperative, because he had been a participant in the original arrangement by which the sale had been made in secret, and purposely concealed from her.
One wlio has a claim to property, and stands by and sees another negotiating for the purchase of it; and remains silent ; or who being consulted about his title or claim to property, or about the policy of a purchase contemplated by another, is bound to disclose his right, title or claim to the pro ' perty in question ; and if he disclaims,or remains silent, he is guilty offraud upon the party contemplating the purchase,— and shall be postponed in his favor. — To this principle, that of the preceding note is analo-/ gous.
When it was first determined, in the case of Pasley vs. Freeman, 3 D. & E. 51, that a man was liable to an action for knowingly and falsely representing an insolvent as worthy of credit, it was at the same time conceded that he was not bound to give his opinion or information on such subject, if he chose to withhold it, and that he had the privilege of silence. He, however, has no such privilege of reserve and silence, when he witnesses a negotiation for his property, or when he is applied to by one intending to purchase, to know whether he has any claim to it. The purposes of trade, and the interests of society generally, require that, one intending to purchase should have the right to make such.enquiry, and that the other should be bound to answer. . The law accordingly makes it his duty to give an answer. None of the reasons upon which he is exempted from communicating his knowledge of the insolvency of his neighbor, require a similar exemption when asked as to his interest in property which the enquirer is about to pur-, chase. There can be no legitimate motive for concealing his proprietorship sufficient to exempt him from the fulfilment of such a social duty. The law attaches no importance, and allows no validity to any such motive. All its principles tend to promote and enforce the uncloaking rather than the concealing the true proprietorship of property The information which one has of the state'of his neighbor’s affairs is his own. No other, can claim .it of him as a right. The rules of morality would, no doubt, many times, require its disclosure. But it is a duty of too imperfect an obligation for the law to enforce. ' Such information is not a species of property to be trafficked with, and in the purchase of which a third person may be defrauded and injured. It is not a permitting another so to use that which is ours, as to prejudice others. On the contrary, if, when apprized that our own property is about to be sold by a third person, and when applied to, we fail to disclose our right, we give an implied assent to the sale, and by permitting him so to use that which is oui’s, to the pres judice of others, we violate the golden rule for our go *16 vcrnment in the enjoyment of all property, and become participants in the fraud of the seller.
This court has repeatedly recognised and acted upon the principle, that the owner of property shall not, with impunity, either advise another to purchase it of a third person, or stand by pending a negotiation for it, without disclosing his right. It has been still more frequently and extensively acted upon in other courts. This case comes within the reach of that principle. The standing by, spoken of in the books, does not mean an actual presence, a meeting face to face of both vendor and purchaser at the final consummation of the bargain. The application to him for information, is equivalent to bringing him to the treaty groundj and making him witness it; and if at any stage of the negotiation, he is present, and fails to apprize the purchaser of his right, his silence is treated as an assurance that the vendor has the right, or at least that he himself has none. The plainest -dictates of honesty, as well as public policy, require that he should not afterwards be permitted, for his own benefit, to retract this assurance. It is true, that, in Osborn vs. Lee, 9 Mod. 96, it was held, that a person having an incumbrance on an estate is not bound voluntarily to notify one whom he knows to be in treaty for its purchase, unless he be present whilst the treaty is going on ; and, in Ibbotson vs. Rhodes, 2 Vern. 554, it was decided that, an incumbrancer, who, when applied to, denied that he had any incumbrance, should not be postponed in favor of the purchaser who made the application, because the latter, at the time of making the application, had not communicated his intention of making the purchase, and the other was under no obligation to gratify mere idle curiosity. These cases do not militate against the general principle, but, like all mere exceptions to a rule, tend rather to prove and sustain it. In the first case, it is evident from the reasoning of the court, that if the incumbrancer had been present at the negotiation, he would have been bound to disclose his incumbrance. In the second, the court awarded an issue to ascertain whether the purchaser had apprized the incumbrancer of hi's intention to purchase, which would not have been done *17 unless that had been deemed a controlling circumstance.
“All laws which go to enforce moral and social duties stand upon the best and broadest basis.” Such of them as are to be found in our code should be enforced according to their true'spirit. They are none of them the creations of mere speculative ethics, but of sound practical wisdom, adapting its legislation to the real exigencies and actual condition of society. They should never be strained beyond their proper scope and bearing; neither should exceptions from their operation be allowed upon nice and unessential distinctions. It can avail nothing, therefore, to distinguish this case from others found in the books, in the particulars of there not having been an actual negotiation pending between Mrs. Morrison and a third person, for a-surrender of her interest under the will, in consideration of what the law would give her in opposition to it, and that she did not actually propound the question to David C. Morrison, whether the slaves were his or not. The act of renunciation depended upon her own volition merely, and the transaction was insusceptible of the character of a negotiation with a third person. But it had all the ingredients - necessary to the doing herself prejudice through ignorance of his rights, which rendered it equally incumbent on him to disclose them. She did not ask him in terms, whether the slaves were his, because she had no reason to suspect they were. He could not but have been conscious, that, from that cause alone, she forbore the question. When she communicated her object, and asked bis advice, he was apprized that she was no idle or impertinent enquirer, and that the obtention of a portion of the slaves was the principal, if not sole inducement to the act she had in contemplation. Aware, as he was, that she had been kept ignorant of his purchase, the asking his advice, was the asking each and every question necessary to the elucidation of the subject, and affording her the means of forming a correct judgment as to her course. It was a substantial trafficking for bis property, in ignorance of his concealed right, *18 under his view and in his presence. He must abide ífog penalty of his culpable silence. ,
A man takes a secret conveyance of slaves, fy permits them to continue upon the form of the grantor until after his death, and until his widow,ignorant of the conveyance, and believing that the slaves constitute part which she may nouncesthe’pro vision made for permÍttino-Wthé slaves to remain whereby they'ddow was^deceiamount of estute: left by her husband,- is a fraud upon her, affcotmg the grantee s right, against which, lowed heibdowI or in the slaves,
Should we be evert'mistaken in this application of the principle, there is another of analogous character, which equally leads to the same result. If David C. Morrison, after his purchase, or even after the death of his brother, had not suffered the slaves to remain where they were; if he had exercised his absolute proprietorship by taking them into his own possession, Mrs. Morrison would not'have been liable to be deceived by false appearances into the renunciation which she made. If she had stood strictly in the attitude of a purchaser, the bare fact of leaving the possession where he did, would have been held such full evidence of a fraudulent jnfent on p}s part, as effectually to have shielded her from any assertion of his claim. The circumstances of case £*ve the fullest force- to that implication.— When lie suffered the possession to remain where it was, a^er he had been apprized of her intention to renounce, and after he had failed to disclose his ownership, he did that which was best calculated to deceive her ; and although she may not stand strictly in the attitude of a purchaser, yet it is no stretch of' the principle to suffer p j0 protect her as though she had been. Her rights ' ’ ™ . ° are fully as meritorious and worthy of protection as ^j10se 0f a purchaser. She was liable to be deceived, r t- 3 and was deceived, in the very way, and by the very acts, which the law presumes will'deceive him. The principle, therefore, that protects him can be little worth —it must rest upon a very unstable basis, if it cannot be made to afford the same protection to her also. There is no virtue in the mere circumstance of being a purchaser, otherwise than as it presents a subject worthy of the protection of the law against fraud.. Its antipathy to¡ fraud is not partial, or confined to particular cases or classes of cases, except so far as classification serves to embrace and indicate every thing it deems worthy of protection. Every thing worthy of its protection it panoplies in proof against all the approaches of fraud. When the purchaser of personal estate, by absolute bill of sale, leaves it in the possession of the vendor, the law, *19 far the protection of a subsequent purchaser without notice, infers a fraudulent intent on the part of the first purchaser ; and then, by reason of the fraud so ascertained, postpones his claim to that of the second purchaser. Here, the leaving of the slaves where they were, the not taking them into his own possession, was equally calculated to produce a similar mischief to the widow. But, we are not left to the implication the law makes in favor of á purchaser, for the attending circumstances leave little room to doubt, that the possession was so left for the express purpose of deceiving her into an act injurious to herself. There is no explaining the conduct of David C. Morrison on any other hypothesis. Even though, therefore, the law would not. infer the fraudulent intent for the protection of the widow, in this case, as it would in favor of a purchaser, yet,. ■when that intent is otherwise satisfactorily made out, the result in her favor must be the same. It is no solid objection to this application of the principle, that it is new in the instance. The application of the principles of law, for the prevention of fraud, are circumscribed by the bounds of guile and malevolence alone :. where they reach, it will also extend, to shield the. innocent, and unwary.
The prayer for the distribution of whatever personal-estate there may be in the hands of the executor, appears to have been overlooked in rendering the decree. On the return of the cause, Sarah C. Morrison will again have to be brought before the court, either as complainant or defendant, and that part of the case properly disposed of.
The decree must be reversed, with costs, and the cause-remanded for further proceedings, and with directions to allot Mrs. Morrison dower out of the slaves, as claimed .by her, and for a decree against David C. Morrison for her third of their hire from the filing of her bill.